```
IN THE UNITED STATES DISTRICT COURT FOR THE
            EASTERN DISTRICT OF OKLAHOMA
```

| | | |
|---|---|---|
| LORRI MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV-07-223-FHS |
| | ) | |
| LEFLORE COUNTY DETENTION CENTER | ) | |
| PUBLIC TRUST, COUNTY OF LEFLORE, | ) | |
| LORETTA JAMES, in her individual | ) | |
| and official capacity, and | ) | |
| TRAVIS SAULSBERRY, in his | ) | |
| individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Lorri Myers ("Myers") brings this civil rights action pursuant to the authority of 42 U.S.C. § 1983 claiming her constitutional rights were violated during the early morning hours of September 1, 2006, in connection with her nearly four-hour incarceration in the Leflore County Detention Center ("LCDC") on a charge of public intoxication. Myers contends her Fourth Amendment right to be free from unreasonable seizures was violated when her detention was continued even after her bond had been paid and the arresting entity, the Town of Pocola Police Department, had informed LCDC authorities that she could be released. Myers also contends she was subjected to a strip search at the LCDC in violation of the Fourth Amendment. Myers' final constitutional claim involves her contention that her Eighth and Fourteenth Amendment rights were violated in connection with the LCDC's nonconsensual and invasive booking procedures and by not being provided sufficient clothing and hygiene items during her incarceration. In addition to her

1

constitutional claims, Myers asserts state law tort claims under the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 O.S. § 151 *et seq.* for negligent infliction of severe emotional distress, intentional infliction of severe emotional distress, negligent hiring and retention, and invasion of privacy. Myers has named as Defendants the Leflore County Detention Center Public Trust ("LCDC Public Trust"), the County of Leflore ("County"), Travis Saulsberry ("Saulsberry"), and Loretta James ("James"). Saulsberry was the Administrator of the LCDC at the time of this incident. James is a female LCDC detention officer, who was primarily responsible for the processing of Myers into the LCDC.

The Court has before it for its consideration the Motion for Summary Judgment by Saulsberry and James (Doc. No. 94) and the Motion for Summary Judgment by LCDC and the County (Doc. No. 95).

## SUMMARY JUDGMENT STANDARDS

The standards relevant to the disposition of a case on summary judgment are well established. Having moved for summary judgment in their favor under Rule 56 of the Federal Rules of Civil Procedure, Defendants' initial burden is to show the absence of evidence to support Myers' claims. Celotex v. Catrett, 477 U.S. 317, 325 (1986). Defendants must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact. Universal Money Centers v. AT&T, 22 F.3d 1527, 1529 (10th Cir.), cert. denied, 115 S.Ct. 655 (1994) (quoting Fed. R. Civ. P. 56(c)). Defendants' need not negate Myers' claims or disprove her evidence, but rather, their burden

2

is to show that there is no evidence in the record to support her claims. Celotex, 477 U.S. at 325. Myers, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [she] carries the burden of proof." Applied Genetics v. First Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990).

Summary judgment is not appropriate if there exists a genuine material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson, 477 U.S. at 248). In this regard, the court examines the factual record and reasonable inferences therefrom in the light most favorable to Myers. Deepwater Invs. Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**FACTUAL BACKGROUND**

Late in the evening on August 31, 2006, the pickup truck in which Myers and her husband, Ronald Myers, were riding was stopped by Town of Pocola police officer, Terry Gouker ("Gouker"), at a traffic checkpoint. After the stop, Ronald Myers, who was the driver of the vehicle, was ordered out of the vehicle and he was administered field sobriety tests by Gouker.

After completing the tests, Ronald Myers was handcuffed and placed under arrest for driving under the influence. During the course of the ensuing search of the pickup truck, Myers was ordered out of the vehicle by Gouker. Field sobriety tests were likewise administered to Myers and she was handcuffed and placed under arrest for public intoxication.[1] Gouker then transported both Myers and her husband to the LCDC for processing on their respective charges.

Myers arrived at the LCDC for booking at 12:52 a.m. on the morning of September 1, 2006. Myers was taken to the booking area and asked numerous health, medical, and biographical questions as set forth in the LCDC Medical and Biographical Information Form (Doc. No. 94, Exhibit No. 9). In response to these questions, Myers acknowledged that she had consumed four liquor drinks in the previous twenty-four hours. At the conclusion of this questioning, Myers was given a property sheet to sign to verify her property and she was escorted by James to the search and shower room, which was connected to the booking area by a door. James told Myers to remove her clothes so that they could be searched. James was the only individual with Myers in the search and shower room at this time. Myers removed her clothes in James' presence and was visually searched by James, but no body cavity search was conducted. James testified in her

---

[1] In her brief, Myers references her Second Amended Complaint and disputes that she was ever given field sobriety tests. She contends she was only given orders concerning such tests – not that she performed them. A review of the Second Amended Complaint does not support Myers version, however, as she states that "[a]fter [she] was out of the pickup, she was ordered to perform certain field sobriety tests by the defendant Officer. After [she] complied with the defendant Officer's order, [she] was placed under arrest and was handcuffed." Second Amended Complaint, ¶¶ 31 and 32.

deposition that she performed a strip search of this sort for all bookings into LCDC. Doc. No. 107, Exhibit G, p. 60, lines 1-15. James gave Myers a towel, shampoo, jail clothes, and she was told to shower. Myers requested a tampon, but none were available, and James provided Myers with a maxi pad and boxer shorts. James told Myers to get dressed in her jail clothes after showering and that she, James, would be monitoring Myers through the door to the booking area, which Myers contends was left open. Myers contends that while showering she could see James in the booking area if she positioned herself towards the right part of the shower, but also, that she couldn't be seen by James if she positioned herself towards the corner of the shower. During the course of her shower, Myers contends she saw a male inmate sweeping the floor in the booking area and that he walked by the door at least two times. Myers is not sure if this male inmate saw her in the shower room or even if he looked in the shower room.[2] After Myers showered and changed into her jail clothes, she was taken to the detoxification cell. At 1:23 a.m. on September 1, 2006, the LCDC received a fax transmission from the

---

[2] James has no independent recollection of the events surrounding the booking of Myers on September 1, 2006. To counter Myers' version of the events, James, Saulsberry, and Betty Harris, the current LCDC Administrator, testified in their depositions as to the typical procedures followed when booking and processing a female arrestee such as Myers, including the operation of the automatic locking solid door to the search and shower room. Defendants argue the door had to be propped open to remain open and that James would not have done so. Defendants also make reference to the configuration of the booking area and search and shower room, including the presence of a separate door to the shower portion of the search and shower room, to argue that it is impossible for someone in the shower to be seen from the booking area. On summary judgment, the Court is obligated to review the factual record in the light most favorable to Myers; consequently, while Defendants' version of these factual issues is noted, the Court recognizes the factual dispute presented by the record and it recites Myers' version for purposes of analyzing the summary judgment motions.

Town of Pocola Police Department stating "[c]oncerning prisoner Lori Myers has paid in full please release her from your custody." Myers remained in the detoxification cell until she was released at 4:50 a.m. on September 1, 2006, - just shy of four hours from the time she arrived at LCDC for booking.

## **FOUR-HOUR DETENTION RULE**

Myers contends her Fourth Amendment[3] right to be free from unreasonable detention was violated by being detained for nearly four hours. Myers contends the length of her detention was unreasonable given that the Pocola Police Department notified the LCDC at 1:23 a.m. on September 1, 2006, that Myers' bond had been paid and that she could be released.

It is undisputed that Myers was detained in the LCDC pursuant to an unwritten LCDC policy of detaining individuals arrested for intoxication for four hours before they are eligible to be released. In isolation, this policy clearly does not violate the Fourth Amendment's prohibition against unreasonable seizures as a brief period of detention following an arrest for intoxication is permissible given that "the state . . . has an interest in protecting the public from the intoxicated and the intoxicated from themselves." <u>Anaya v. Crossroads Managed Care Sys.</u>, 195 F.3d 584, 591 (10th Cir. 1999). Myers, however, contends that the application of any such fixed-hour rule imposes upon the institutional authority the obligation to determine whether it has probable cause to believe the arrestee is a danger to herself or to others. In this regard, Myers contends that

---

[3] The Fourth Amendment is made applicable to the states through the Fourteenth Amendment. <u>See</u> <u>Mapp v. Ohio</u>, 367 U.S. 643, 650 (1961).

6

once the Pocola Police Department faxed the information about Myers making bond and her husband arrived to take her home[4], the LCDC was obligated to release her and the failure to do so equates with an unreasonable seizure within the meaning of the Fourth Amendment.  The Court disagrees.

Myers relies on two cases in support of this argument – Anaya and McConney v. City of Houston, 863 F.2d 1180 (5th Cir. 1989).  In Anaya, the plaintiffs were seized by the police, transported to an alcohol detox center, and detained.  The Tenth Circuit determined that "to justify seizure for intoxication for alcohol, an officer must have probable cause to believe an intoxicated person is a danger to himself or others." Anaya, 195 F.3d at 591.  Myers argues that the undisputed testimony is that she was not intoxicated and that probable cause did not exist to support the arrest and subsequent detention.  This argument, however, is an attempt to divert the focus from the knowledge of the LCDC officials in connection with the detention of Myers to the knowledge of the Gouker in making the arrest for public intoxication.  As a detention facility accepting arrestees from the Town of Pocola Police Department, the LCDC and its employees are not responsible for the arrest of Myers or the probable cause determination made by Gouker, the arresting officer.  The LCDC is entitled to rely on the probable cause determination made by the arresting officer when Myers was accepted into its facility for detention.  See Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1180 (10th Cir. 2003)(nurses and medical personnel assisting police are entitled to rely on the probable cause determinations of law enforcement officers when performing a

---

[4] Although not clear from the record, Myers' husband apparently passed a breathalyzer test at the LCDC and was released shortly after being brought into the LCDC.

warrantless and coerced blood test). Thus, with respect to the actions and accountability of LCDC officials, the Court concludes that Anaya does not impose an independent determination of probable cause for Myers' arrest and that James was entitled to rely on the probable cause determination made by the Gouker.[5]

Myers contends that even assuming James could rely on Gouker's determination of probable cause to arrest for public intoxication, McConney dictates that James could not continue to rely on that determination after the fax was received from the Pocola Police Department. McConney, a diabetic, was arrested for public intoxication after officers found him in a rain-filled ditch in Houston, Texas. McConney was conscious, but had slurred speech and failed to respond to questioning. McConney was taken to the city jail and detained pursuant to a similar four-hour detention policy[6] even though there was evidence that McConney informed jail medical personnel that he was having an insulin reaction, that he told the booking officer he was not drunk, that he tried to make bail with money in his possession, and, most significantly, that the booking officer told McConney that he knew McConney was sober, but that the four-hour rule prevented him from releasing McConney. McConney, 863 F.2d at 1183. In

---

[5] The Court notes that in Anaya the Tenth Circuit rejected the argument of the detention facility that "[s]ince there was probable cause for the criminal arrests . . . there was probable cause for the detention to detox." Anaya, 195 F.3d at 591. This statement is not a renunciation of the rule that detention facility employees are entitled to rely on the probable cause determinations made by an arresting officer. This statement was made in the context of arrests on charges *other than* those related to alcohol and the Tenth Circuit concluded that "[a} legitimate-though-unrelated criminal arrest does not itself give probable cause to detain the arrestee to detox." Id. at 592.

[6] McConney spent thirty to forty-five minutes in a holding cell and about seven or eight hours in a regular cell. McConney, 863 F.2d at 1183.

addressing the issue of the "reassessment" of probable cause during an arrestee's detention, the Fifth Circuit held:

> We conclude that a person may constitutionally be detained for at least four or five hours following a lawful warrantless arrest for public intoxication without the responsible officers having any affirmative duty during that time to inquire further as to whether the person is intoxicated, even if requested to do so. However, once a responsible officer actually does ascertain beyond a reasonable doubt that one who has been arrested is in fact not intoxicated, the arrestee should be released. This rule strikes the proper balance as it prevents the officer responsible from willfully continuing detention of one so arrested who the officer has now actually ascertained beyond reasonable doubt is not intoxicated, without requiring the officer to reassess the initial probable cause finding at every change in circumstances or protestation of the arrestee.
> (footnote omitted).

Id. at 1185. The rule set forth by the Fifth Circuit in McConney, however, does not assist Myers as the evidence in this case does not establish that James ever ascertained, beyond a reasonable doubt or otherwise, that Myers was not intoxicated. In this regard, the relevant evidence establishes that Gouker made a determination that there was probable cause to support an arrest on a charge of public intoxication and that Myers admitted during the booking procedure that she had consumed four alcoholic drinks within the preceding twenty-four hours. Thus, there was never any determination made by James that Myers was not intoxicated and James' enforcement of the LCDC's four-hour rule did not violate Myers' Fourth Amendment right to be free from unreasonable detention.

**BOOKING PROCEDURES, HYGIENE, CLOTHING, AND SHOWER VIEWING**

Myers contends her Eighth and Fourteenth Amendment rights were violated when she was not provided proper feminine hygiene products and clothing to control her menstrual discharge, when she was asked personal and medical questions in the presence of a male inmate during the booking process, and when she was exposed to a male inmate while she was naked in the shower. The Court finds that no constitutional violations are implicated by these allegations.

As a pretrial detainee, Myers was entitled to constitutional protection with respect to the conditions under which she was being held. Such a claim has its genesis in the Fourteenth Amendment's guarantee of substantive due process. See Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir. 1996). This claim, however, is analyzed under the Eighth Amendment's "deliberate indifference" standard, which is made applicable to the states through the Fourteenth Amendment. See Barney v. Pulsipher, 143 F.3d 1299, 1310 n.10 (10th Cir. 1998); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996). In this context, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). Two elements must be established to sustain a claim related to jail conditions or inmate safety: First, a pretrial detainee must show that (1) the condition complained of was sufficiently serious to implicate constitutional protection and (2) that the jail official was deliberately indifferent to the detainee's health or safety. Reynolds v. Powell, 370 F.3d 1028, 1031 (10th Cir. 2004). A sufficiently serious jail condition is one which exposes a detainee to "a substantial risk of serious harm." Id. Such

conditions may be harsh and restrictive without violating constitutional rights, Barney, 143 F.3d at 1311, and the relevant inquiry involves a review of the "circumstances, nature, and duration" of the conditions with "the length of exposure to the conditions . . . of prime importance." DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001). The jail official's state of mind is measured by a subjective standard, rather than an objective one. That is, the jail official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

The Court's application of these standards to Myers' allegations with respect to feminine hygiene products, clothing, and the questioning during the LCDC booking procedure results in a finding that such allegations are not sufficiently serious to implicate Myers' constitutional rights. While James' failure to provide Myers with her desired choice of a tampon and panties to control her menstrual discharge during her four-hour stay at LCDC certainly may have caused Myers some discomfort, even embarrassment, it did not expose her to a "substantial risk of serious harm." Likewise, while the intake procedure of asking questions in the booking area where other individuals may have been present, including other detainees being processed, may not be the optimum procedure to follow when processing arrestees, there is no evidence that such procedure exposed Myers to a substantial risk of harm sufficient to implicate constitutional protection. Finally, with respect to the allegation that she was exposed to an inmate while she was naked in the shower, the Court concludes the evidence does not establish any viewing, much less a regular viewing, by inmates sufficient to establish a constitutional violation in this context. In fact, Myers

testified that she is not sure if the male inmate who was sweeping the floor in the booking area ever saw her in the shower room or if he even looked in the shower room.  Moreover, Myers testified that if she positioned herself a certain way in the shower that she could not be seen by anyone in the booking area. Under these factual circumstances, the Court concludes no constitutional violation has been established with respect to Myers' claim that she was viewed naked in the shower by another inmate.  See Hayes v. Marriott, 70 F.3d 1144, 1147 (10th Cir. 1995)(an analysis of the "frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering is an important factor in assessing the constitutionality of prison practices," although a prisoner's right to privacy may be violated by a single search under certain circumstances).  Consequently, Myers' constitutional claims related to the booking procedures, feminine hygiene products, clothing, and shower viewing are subject to summary adjudication in favor of Defendants.

## STRIP SEARCH

Myers contends James performed a strip search in violation of the Fourth Amendment when James required her to remove her clothes in the search and shower room in James' presence as part of the routine booking procedures of the LCDC.  In response, James argues that Myers was not subjected to a "full strip search," but rather that she "was required only to disrobe and shower and her clothes were searched."  Doc. No. 122, pp. 6-7. From this statement and the relevant portion of James' deposition testimony[7], the Court understands James to be arguing that Myers

---

[7] In her deposition, James testified that the normal procedure is for her to escort the arrestee to the shower, the

was not visually searched by her, but that Myers was required to remove her clothes *outside the view of James* and that Myers' *clothes* were then searched without James ever viewing her naked body. These different factual scenarios preclude resolution of Myers' Fourth Amendment claim in connection with the strip search. There are genuine issues of fact as to whether Myers was subjected to a strip search or, simply, whether she was asked to undress in the shower, *outside the view of James*, with her clothes then searched after Myers passed them out to James. If no strip search occurred, Defendants would clearly be entitled to judgment in their favor. On the other hand, if a strip search took place as testified to by Myers, the analysis set forth by Tenth Circuit case law, particularly <u>Archuleta v. Wagner</u>, 523 F.3d 1278 (10th Cir. 2008) and <u>Hill v. Bogans</u>, 735 F.2d 391 (10th Cir. 1984), would govern the propriety of any such strip search. <u>See</u> <u>also</u> <u>Draper v. Walsh</u>, 790 F.Supp. 1553 (W.D. Okla. 1991). That analysis, however, must await a resolution of the underlying issue of whether a strip search of Myers took place. The Court therefore finds that genuine issues of fact preclude the issuance of summary judgment on the grounds alleged by Defendants in connection with the strip search claim. The Court likewise finds that genuine issues of fact preclude summary judgment on the

---

arrestee steps into the shower, and she "asks them to please remove their clothes . . . and [she] search[es] their clothes as they're being taken off and put into our bag." Doc. No. 107, Exhibit G, p. 45, lines 2-4. James also testified in general terms as to the LCDC's strip search policy:

    Q: When are you required to perform a strip search of a female inmate at the Detention Center?
    A: At all bookings.
    Q: Strip search. Do you know what a strip search is? What is a strip search, to your knowledge?
    A: Take their clothes off and search them.

    Doc. No. 107, Exhibit G, p. 60, lines 10-15.

strip search claim with respect to Saulsberry and the LCDC Public Trust as there remain unresolved factual issues concerning supervisory and governing-body liability.

James and Saulsberry also assert an entitlement to summary judgment on the basis of qualified immunity. The affirmative defense of qualified immunity is available to all government officials.[8] Harlow v. Fitzgerald, 457 U.S. 800 (1982). This is an immunity from suit and not merely a defense to liability. Pueblo Neighborhood Health Centers v. Losavio, 847 F.2d 642, 644-45 (10th Cir. 1988) and England v. Hendricks, 880 F.2d 281 (10th Cir. 1989), cert. denied, 493 U.S. 1078 (1990). The test the Court must apply is an objective one which inquires into the objective reasonableness of the official's actions. Harlow, 457 U.S. at 816. Government officials performing discretionary functions will not be held liable for their conduct unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818; see also Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997)(quoting Harlow). As the Court has held there are genuine issues of fact as to whether a strip search occurred, this

---

[8] Myers argues that James and Saulsberry are not entitled to assert qualified immunity because they are private employees. The Court disagrees. James and Saulsberry are employees of the LCDC Public Trust, an entity created pursuant to Oklahoma public trust law, 60 O.S. § 176 et seq. The LCDC was formed to operate the LeFlore County jail facility with the County as the beneficiary. The LCDC Public Trust is an entity which performs a public function, the operation of a jail facility, and it is invested with powers associated with those exercised by governmental entities, such as the right of eminent domain. 60 O.S. § 176(I). Consequently, it is the Court's opinion that James and Saulsberry, as employees of this public trust, are entitled to assert the defense of qualified immunity. See Beedle v. Wilson, 422 F.3d 1059, 1065 (10th Cir. 2005)(a hospital, created as a public trust under 60 O.S. § 176 et seq., is a governmental entity for purposes of section 1983).

qualified immunity argument must likewise fail at this stage of the litigation due to these unresolved factual issues.

## **LIABILITY OF THE COUNTY AND THE LCDC PUBLIC TRUST**

Myers seeks to impose liability on the County and the LCDC Public Trust by bringing suit against Saulsberry in his official capacity as Jail Administrator and by directly bringing suit against these two entities.[9] Myers' official capacity suit is an attempt to hold the County and the LCDC Public Trust accountable for the alleged constitutional deprivation. The County argues that it is not a proper party to this action as the LCDC Public Trust is the entity responsible for the day-to-day operations of the LCDC.[10] The Court agrees. As of July 6, 2004, the LCDC Public Trust took control of the LeFlore County jail facility and it has operated the LCDC since that time pursuant to its creation as a public trust under a Trust Indenture and Oklahoma law. See Doc. No. 95, Exhibits 6 and 7. Consequently, the appropriate governing body against which suit can be brought is the LCDC Public Trust.

---

[9] Myers concedes that she is not suing James in her official capacity.

[10] The County also contends it has not been properly named as Oklahoma law requires that in any suit against a county the proper method for bringing suit is to name the "Board of County Commissioners" of that county as the defendant. 19 O.S. § 4. Myers has filed a Motion to Substitute or Join Party to cure this deficiency. Doc. No. 104. Because the Court finds the LCDC Public Trust is the proper governing-body defendant, and not the County, the motion to substitute or join is futile. The Court has denied Myers' Motion to Substitute or Join Party by separate minute order of this date.

**STATE LAW CLAIMS**

Myers asserts state law claims for negligent and intentional infliction of severe emotional distress, negligent hiring and retention of employees, and invasion of privacy. As a "political subdivision" pursuant to section 152(d) of the OGTCA, the LCDC Public Trust is exempt from tort liability for such claims. Section 155 (24) of the OGTCA provides that "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . [p]rovision, equipping, operation or maintenance of an prison, jail or correctional facility." As Myers' remaining claim related to the alleged strip search clearly involves the operation of the LCDC by the LCDC Public Trust, a "political subdivision" under the OGTCA, the immunity from suit provided by section 152(24) operates in favor of the LCDC Public Trust and bars such state law claims against it.

Likewise, the state law claims against James and Saulsberry are barred. Under the OGTCA, political subdivision employees such as James and Saulsberry are entitled to immunity for torts committed within the scope of their employment. 51 O.S. § 153B and 163C. Under 51 O.S. § 152(9), "scope of employment" is defined as "performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority . . . ." Actions outside the scope of one's employment are those which are malicious or taken in bad faith. Pellegrino v. State ex rel. Cameron University, 63 P.3d 535, 537 (Okla. 2003). Here, although Myers asserts that James and Saulsberry acted with "gross negligence" and outside the scope of their employment, she fails to support this allegation with any evidence to suggest, much less establish, that James and Saulsberry were acting other

16

than in compliance with detention facility procedures regarding the alleged strip search. The good faith performance of these tasks by James and Saulsberry as part of their employment with the LCDC Public Trust insulates them from liability for the state law claims under the OGTCA notwithstanding the fact that it may ultimately be determined that any such strip search is constitutionally deficient.

**PUNITIVE DAMAGES**

Myers claims she is entitled to punitive damages against James, Saulsberry, and the LCDC Public Trust on her remaining section 1983 claim related to the alleged strip search. As to the LCDC Public Trust, it is clear that as a governing body it is immune from punitive damages under 42 U.S.C. § 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981). As to James and Saulsberry, they would be subject to punitive damages if it can shown that their conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. § 30, 56 (1983). No such evidence has been presented by Myers; consequently, the request for punitive damages against James and Saulsberry on Myers' section 1983 claim related to the strip search must fail.

**CONCLUSION**

Based on the foregoing reasons, the Motion for Summary Judgment (Doc. No. 94) filed by James and Saulsberry is granted in all respects, with the exception of Myers' Fourth Amendment claim related to the alleged strip search. The Motion for Summary Judgment (Doc. No. 95) filed by the County and the LCDC

Public Trust is granted in its entirety as to the County and is granted in all respects as to the LCDC Public Trust, with the exception of Myers' Fourth Amendment claim related to the alleged strip search.

It is so ordered this 12th day of January, 2009.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma